UNITED STATES of America, Plaintiff,

v.

Louis K. DAVIS, Defendant.

No. 4:07CR600.

United States District Court, N.D. Ohio, Eastern Division.

June 18, 2008.

Nancy L. Kelley, Office of the U.S. Attorney, Cleveland, OH, for Plaintiff.

## ORDER

PETER C. ECONOMUS, District Judge.

This matter is before the Court upon two Motions to Suppress Evidence filed by Defendant Louis K. Davis. (Dkt. # 17; Dkt. # 23).

## I. PROCEDURAL BACKGROUND

The Government filed the Indictment in the instant matter on November 27, 2007, charging the Defendant with two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Dkt. # 1). The Defendant entered a plea of not guilty to each count of the Indictment.

On February 19, 2008, the Defendant filed a Motion to Suppress Evidence related to Count 1 of the Indictment. (Dkt. # 17). The Defendant filed a second Motion to Suppress Evidence related to Count 2 of the Indictment on February 28, 2008. (Dkt. # 23). The Government filed a response to both Motions on March 11, 2008. (Dkt. # 25). Pursuant to 28 U.S.C.

§ 636(b)(1)(B) and LR 5.1(f), the Court referred the matter to Magistrate Judge George J. Limbert to conduct a hearing on both Motions and to issue a report and recommendation. (Dkt. # 27).

Magistrate Judge Limbert consolidated the motions for hearing on April 30, 2008. On May 1, 2008, the Government moved to reopen the suppression hearing to correct the testimony of one of the Government's witnesses, Officer Robert Patton of the Youngstown Police Department. (Dkt. # 34). Magistrate Judge Limbert granted the Government's motion and reopened the suppression hearing on May 5, 2008. (Dkt. # 39). At Magistrate Judge Limbert's direction, the Defendant filed a memorandum of law on the issues raised in both Motions on May 7, 2008. (Dkt. # 40). The Government filed a response on May 8, 2008. (Dkt. # 41).

On May 13, 2008, Magistrate Judge Limbert issued a report and recommendation recommending that the Court grant both of the Defendant's Motions to Suppress Evidence. (Dkt. # 42). The Government timely filed objections to the Magistrate Judge's report and recommendation. (Dkt. # 45).

On June 4, 2008, the Court, *sua sponte*, recalled two Government witnesses, Mahoning County Deputy Sheriff Lawrence McLaughlin and Officer Jeff Pantall of the Struthers Police Department, for further questioning by the Court regarding the officers' participation in the events related to Count 1 of the Indictment.

## II. MOTION TO SUPPRESS EVIDENCE RELATED TO COUNT 1 OF THE INDICTMENT

The felon in possession charge in Count 1 of the Indictment is based upon the discovery of a firearm in the Defendant's vehicle following a traffic stop on October 4, 2007. (Dkt. # 1). The Defendant challenges the validity of the traffic stop and subsequent search under the Fourth Amendment to the United States Constitution.

### A. Officer Patton's Testimony

Officer Patton testified at the suppression hearing that, as a narcotics investigator for the Mahoning Valley Law Enforcement Task Force, he had set up a controlled purchase of marijuana through a cooperating source, to be conducted at a particular location in the City of Youngstown. (Transcript of April 30, 2008, Suppression Hearing ["Tr."] at 4–5). According to Officer Patton's testimony, he observed the target of the investigation arrive at the purchase location as a passenger in a green Lincoln Continental with Ohio license plates, exit the vehicle, complete the drug transaction, and return to the vehicle, which then departed the location.[1] (Tr. at 5). Officer Patton testified that while the vehicle was present at the purchase location, he determined that it was registered to the Defendant. (Tr. at 6).

Officer Patton then testified that while he was still at the purchase location, he observed the green Lincoln return to the area approximately fifteen to twenty minutes after it had departed. (Tr. at 9). He followed the Lincoln in an unmarked Task Force vehicle, proceeding eastbound on Indianola Avenue in Youngstown. (Tr. at 9–10). On direct examination during the April 30 hearing, Officer Patton testified that while following the Lincoln, he observed the vehicle fail to come to a

---

**1.** The Defendant was not the target of the Mahoning Valley Law Enforcement Task Force's October 4, 2007, investigation. The target has not been identified by name in the record before the Court.

complete stop at a stop sign controlling eastbound traffic on Indianola at the intersection of Indianola and Homestead Avenue. (Tr. at 10). He then contacted Deputy Sheriff McLaughlin and Officer Pantall, who were assisting in the controlled purchase, and instructed the officers to perform a traffic stop of the Lincoln for the stop sign violation Officer Patton had observed. (Tr. at 10). Officer Patton testified that he then observed the officers effect the traffic stop of the Lincoln on the Center Street bridge in Youngstown. (Tr. at 10). From his vehicle, Officer Patton saw Officer Pantall accompany the Defendant to the trunk of the Lincoln, and then observed Officer Pantall place the Defendant in handcuffs. (Tr. at 11). Officer Patton then transported the Defendant to the Task Force office. (Tr. at 12). On cross-examination, Officer Patton confirmed that he had observed the stop sign violation at the intersection of Indianola and Homestead. (Tr. at 14–15).

Following the Defendant's presentation at the April 30 hearing, Officer Patton was called by the Government as a rebuttal witness. (Tr. at 51). He again testified that the Defendant committed the stop sign violation at the intersection of Indianola and Homestead. (Tr. at 51). Officer Patton was unable to identify the location of the stop signs depicted in photographs marked Defense Exhibits 2 and 3. (Tr. at 51). The officer then drew a diagram of the intersection of Indianola and Homestead, marked Government Exhibit 1, and indicated on the diagram the location of the stop sign where he observed the violation. (Tr. at 52–53; Gov't Ex. 1). Officer Patton also included on the diagram the next intersection heading eastbound on Indianola, which he labeled "Poland." (Tr. at 54; Gov't Ex. 1).

At the reopened suppression hearing on May 5, 2008, Officer Patton testified on direct examination that following the April 30 hearing, he returned to the intersection where he had observed the stop sign violation and determined that it was actually the intersection of Indianola and Homewood Avenue rather than Indianola and Homestead. (Transcript of May 5, 2008, suppression hearing ["Tr.II"] at 4). He confirmed that there is a stop sign controlling eastbound traffic on Indianola at the Homewood intersection, and stated that he believed there was a traffic light at the intersection of Indianola and Homestead. (Tr.II at 5). On cross-examination, Officer Patton again stated that he believed there was a traffic light at the intersection of Indianola and Homestead. (Tr.II at 8). Defense counsel then showed Officer Patton photographs of the intersection at Indianola and Homestead which demonstrated that there was neither a traffic light nor a stop sign controlling traffic on Indianola at the intersection. (Tr.II at 8–9). Officer Patton agreed that he was inaccurate as to whether a traffic light existed at Indianola and Homestead. (Tr.II at 9).

**B. Deputy Sheriff McLaughlin's Testimony**

At the April 30 suppression hearing, Deputy Sheriff McLaughlin testified that on October 4, 2007, he was working as part of the Mahoning Valley Law Enforcement Task Force in an unmarked vehicle assigned as a "take down" vehicle in a drug investigation in the City of Youngstown. (Tr. at 18). Deputy Sheriff McLaughlin was the driver of the unmarked vehicle, accompanied by Officer Pantall. (Tr. at 18).

On direct examination, Deputy Sheriff McLaughlin testified that in the course of the drug investigation, he conducted a traffic stop of a green Lincoln Continental

with Ohio license plates. (Tr. at 19). Deputy Sheriff McLaughlin stated that the traffic stop was made at the direction of Officer Patton for a stop sign violation, and that the stop occurred on the Center Street bridge in Youngstown at approximately 3:00 p.m. (Tr. at 18–19). He further testified that he did not personally observe the stop sign violation. (Tr. at 18–19). At the June 4, 2008, hearing, Deputy Sheriff McLaughlin testified that he and Officer Pantall were travelling eastbound on Indianola, approximately five cars behind the green Lincoln and three cars behind Officer Patton's vehicle when Officer Patton instructed them to make the traffic stop. (Transcript of June 4, 2008, suppression hearing ["Tr.III"] at 6–7). According to Deputy Sheriff McLaughlin, Officer Patton then pulled over and allowed Deputy Sheriff McLaughlin to go around him in order to perform the traffic stop on the green Lincoln. (Tr.III at 8). Deputy Sheriff McLaughlin stated that the green Lincoln turned right at the end of Indianola onto Poland Avenue and moved into the turning lane to turn left onto Center Street. (Tr.III at 8). The officers got behind the Lincoln in the turning lane on Poland Avenue, followed the vehicle onto Center Street, and made the traffic stop on the Center Street bridge. (Tr. III at 8).

Once the green Lincoln was stopped, Deputy Sheriff McLaughlin approached the driver's side of the vehicle, advised driver that he was stopped for a stop sign violation, and asked for the driver's license, insurance, and registration. (Tr. at 20). The driver, whom Deputy Sheriff McLaughlin identified as the Defendant, stated that his license was in the trunk of the vehicle, at which point Deputy Sheriff McLaughlin allowed the Defendant to exit the vehicle to retrieve the license. (Tr. at 20). Officer Pantall was positioned at the rear of the vehicle with the Defendant. (Tr. at 20). Deputy Sheriff McLaughlin testified that after a few minutes, he observed Officer Pantall place the Defendant under arrest. (Tr. at 21). When Deputy Sheriff McLaughlin looked back at the trunk, he observed marijuana and money in the trunk. (Tr. at 21).

On cross-examination at the April 30 hearing, Deputy Sheriff McLaughlin testified that the stop sign violation occurred at the intersection of Indianola and Homestead. (Tr. at 22–26). Defense counsel then indicated the intersection of Indianola and Homestead on a map of the area, marked Defense Exhibit 1, and asked Deputy Sheriff McLaughlin whether that was the intersection where the violation had occurred. Deputy Sheriff McLaughlin confirmed that it was. (Tr. at 26). On redirect examination, Deputy Sheriff McLaughlin estimated the distance between Homestead and Poland Avenue as a "couple hundred feet" and "not very far at all." (Tr. at 27).

## C. Officer Pantall's Testimony

At the April 30 hearing, Officer Pantall testified that he and Deputy Sheriff McLaughlin were assisting in a controlled drug purchase on October 4, 2007. (Tr. at 29). Officer Pantall stated that the officers performed a traffic stop on a green Lincoln with Ohio license plates on the Center Street bridge in Youngstown. (Tr. at 30). At the June 4 hearing, Officer Pantall testified that he and Deputy Sheriff McLaughlin were part of the surveillance team following the green Lincoln after the controlled drug purchase. (Tr. III at 11–16). He stated that Officer Patton informed the surveillance team by radio that the Lincoln had failed to observe a stop sign, and instructed Officer Pantall and Deputy Sheriff McLaughlin to stop the vehicle. (Tr.III at 14–15). Officer Pantall stated that he and Deputy Sheriff

McLaughlin were approximately two cars behind Officer Patton at that time, and that they went around Officer Patton's vehicle as they crossed the freeway overpass on Indianola. (Tr.III at 15). After passing Officer Patton, Officer Pantall observed the green Lincoln making a right turn onto Poland Avenue. (Tr.III at 16). The officers pulled behind the Lincoln in the turning lane on Poland Avenue, followed the vehicle as it turned left onto Center Street, and then conducted the traffic stop on the Center Street bridge. (Tr.III at 16).

According to Officer Pantall, once the vehicle was stopped, he approached the vehicle on the rear passenger side while Deputy Sheriff McLaughlin went to the driver's side. (Tr. at 31). Officer Pantall heard Deputy Sheriff McLaughlin advise the driver that he was stopped for the stop sign violation and ask for identification, which the driver responded was in the trunk of the vehicle. (Tr. at 31). Officer Pantall stated that he was standing behind the driver when the driver opened the trunk, and that the officer saw cash strewn across the trunk and then detected the odor of marijuana. (Tr. at 31). Officer Pantall testified that he then observed what appeared to be marijuana in a plastic bag in the trunk. (Tr. at 32). At that time, Officer Pantall placed the driver, whom he identified as the Defendant, under arrest. (Tr. at 33).

Officer Pantall further testified that because traffic was heavy at the scene of the stop, the drug Task Force decided to transport the vehicle to the Task Force office. (Tr. at 33). Officer Pantall drove the green Lincoln to the Task Force office, where it was searched prior to being impounded. (Tr. at 33). The search revealed a .40 caliber Smith & Wesson semi-automatic handgun under the driver's seat

along with the Defendant's driver's license. (Tr. at 34).

On cross-examination, Officer Pantall confirmed that the reason for the traffic stop was the stop sign violation, but also noted that the officers were aware that the green Lincoln had been involved in a controlled drug purchase just prior to the traffic stop. (Tr. at 35).

### D. Gerald Salter's Testimony

Following the Government's case in chief at the April 30 hearing, the Defendant called Gerald Salter as a witness. (Tr. at 37). Mr. Salter testified that he was at the Defendant's home on October 4, 2007, performing a tune up and oil change on the Defendant's car, the green Lincoln Continental. (Tr. at 38). When Mr. Salter was finished working on the car, the Defendant began to drive him home in the green Lincoln, on a route along Indianola Avenue. (Tr. at 38). Mr. Salter testified that the two proceeded down Indianola past Homestead, but stated that the Defendant could not have run a stop sign at the intersection of Indianola and Homestead because no stop sign existed at that location. (Tr. at 40). Defense counsel then introduced photographs of the intersection at Indianola and Homestead, marked Defense Exhibits 2 through 4, which demonstrate that no stop sign controls eastbound traffic on Indianola at that intersection. (Tr. at 42–45).

On cross-examination, Mr. Salter testified that he had worked on the Defendant's vehicle from approximately 10:00 a.m. until approximately 2:00 p.m. on October 4, and that neither the vehicle nor the Defendant left the Defendant's house during that time. (Tr. at 46). Mr. Salter further stated that he had been inside the passenger compartment of the vehicle while he was performing the maintenance, but that he had not accessed the trunk.

(Tr. at 47). He testified that neither the marijuana, the cash, nor the firearm discovered in the green Lincoln belonged to him. (Tr. at 49).

### E. Magistrate Judge Limbert's Report and Recommendation

Magistrate Judge Limbert issued a report and recommendation recommending that the Court grant the Defendant's Motion to Suppress Evidence related to Count 1. (Dkt. # 42). The Magistrate Judge based his recommendation on a lack of probable cause for the traffic stop that led to the discovery of the firearm in the Defendant's vehicle. (Dkt. # 42 at 8). Magistrate Judge Limbert found that Officer Patton's testimony was not credible because of inconsistent testimony regarding the street names at the intersection where Officer Patton testified that he observed the stop sign violation, as well as inaccuracies as to the presence of a traffic light at the intersection of Indianola and Homestead. (Dkt. # 42 at 8–10). Additionally, the Magistrate Judge determined that the testimony of Deputy Sheriff McLaughlin and Officer Pantall was not credible based upon the officers' failure to realize and correct their error as to the location of the stop sign violation that led to the traffic stop, despite their significant experience as officers. (Dkt. # 42 at 12).

The officers' apparent lack of credibility led to the Magistrate Judge's finding that the Government had failed to establish by a preponderance of the evidence that Officer Patton actually observed a traffic violation occur. (Dkt. # 42 at 10). As such, Magistrate Judge Limbert determined that the Government had failed to demonstrate probable cause for the traffic stop, and recommended that the evidence of the firearm discovered in the Defendant's vehicle be suppressed as derivative evidence pursuant to *Wong Sun v. United States*,

371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). (Dkt. # 42 at 10–13).

Magistrate Judge Limbert further recommended that the search of the Defendant's vehicle could not be justified either as a search incident to arrest, a search conducted under exigent circumstances, or as an inventory search. (Dkt. # 42 at 15–19).

For the reasons that follow, the Court DECLINES to adopt Magistrate Judge Limbert's Report and Recommendation with respect to the Defendant's Motion to Suppress Evidence related to Count 1 of the Indictment. (Dkt. # 42).

### F. Fourth Amendment Analysis

■ In his Motion to Suppress Evidence related to Count 1, the Defendant contends that the "evidence that was seized is the fruit of an unconstitutional search and seizure [in violation] of the rights guaranteed by the Fourth Amendment of [sic] the United States Constitution." (Dkt. # 17). " 'It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression.' " *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir.2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir.1979)).

■ The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U. S CONST. amend. IV. The warrant requirement protects against unreasonable intrusions by government agents by ensuring: (1) that a neutral and detached officer of the judiciary measure the probable cause asserted; and that (2) "those searches deemed necessary should

be as limited as possible." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). See also *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ("The point of the Fourth Amendment ... is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

#### 1. The traffic stop of the Defendant's vehicle was supported by probable cause.

 Warrantless searches and seizures are per se unreasonable, subject to a limited number of exceptions. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). Thus, where a defendant demonstrates that a warrantless search or seizure has occurred, the burden shifts to the government to prove that an exception applies. *United States v. Herndon,* 501 F.3d 683, 692 (6th Cir.2007). One such exception to the warrant requirement allows a law enforcement officer to stop an automobile where the officer has probable cause to believe that a traffic violation has occurred. *Whren v. United States,* 517 U.S. 806, 809–810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (citing *Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

 "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990). The United States Supreme Court has

shown an "unwilling[ness] to entertain Fourth Amendment challenges based on the actual motivations of individual officers," and has noted that an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren,* 517 U.S. at 813, 116 S.Ct. 1769. Therefore, whether an officer has probable cause to effect a traffic stop based upon a traffic violation depends solely on whether "the circumstances, viewed objectively, justify that action." *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

 In the instant case, Officer Patton testified that he observed the Defendant's vehicle fail to come to a complete stop at a stop sign. (Tr. at 10). Based on that observation, he instructed Deputy Sheriff McLaughlin and Officer Pantall to effect a traffic stop of the Defendant's vehicle for a stop sign violation. (Tr. at 10, 18–19; Tr.III at 14–15). It is clear that an officer's observation of a traffic violation is sufficient to provide probable cause for a traffic stop. *See Whren,* 517 U.S. at 809–810, 116 S.Ct. 1769. Furthermore, it is well-settled in the Sixth Circuit "that probable cause may be established from the collective knowledge of the police," rather than solely from the officer who actually made the stop. *Collins v. Nagle,* 892 F.2d 489, 495 (6th Cir.1989); *see also United States v. Mullins,* 47 F.3d 1171, 1995 WL 66624, *6 (6th Cir.1995). Therefore, if Officer Patton had probable cause to effect a traffic stop of the Defendant's vehicle, the officers who actually made the stop were justified in doing so based upon the information obtained from Officer Patton.

Magistrate Judge Limbert found that the officers' testimony regarding the stop sign violation was not credible and, thus, failed to show that probable cause existed for the traffic stop. Specifically, the Mag-

istrate Judge found that all three officers' inconsistent testimony as to the street names at the intersection where the stop sign violation allegedly occurred, coupled with inaccuracies in Officer Patton's testimony at the May 1 hearing, rendered the traffic stop unconstitutional. Based upon a *de novo* review, the Court finds that the record does not support the Magistrate Judge's conclusion.

First, though Officer Patton testified at the April 30 hearing that the stop sign violation occurred at the intersection of Indianola and Homestead, he gave the following description of the violation:

> I was following the Lincoln eastbound on Indianola Avenue. As it crossed over the overpass of [Interstate] 680, there is a stop sign at Homestead. He failed to come to a complete stop at that location.

(Tr. at 10). Officer Patton further testified on redirect examination:

> Poland Avenue is the next intersection to the east or northeast [in relation to Homestead]. Because Indianola starts to turn and then it comes down the hill and T-bones into Poland Avenue.

(Tr. at 15). Finally, when asked by defense counsel whether Indianola and Homestead intersect, Officer Patton explained:

> Indianola and Homestead cross at [Interstate] 680. And then the next intersection to the east is Poland Avenue.

(Tr. at 16). Though incorrect as to the street name, Officer Patton's descriptions clearly refer to the intersection of Indianola and Homewood, which is immediately east of the Interstate 680 overpass and is the intersection immediately west of Poland Avenue. (*See* Gov't Ex. 2; *see also* Def. Ex. 1). By contrast, Homestead is approximately three-quarters of a mile west of the Interstate 680 overpass, and there are at least ten intersections on Indianola between Homestead and Poland. (*See Id.*)

On rebuttal at the April 30 hearing, Officer Patton drew a diagram of the area where he observed the stop sign violation. (Gov't Ex. 1). That diagram shows Indianola running in an east-west direction, with a perpendicular cross-street labeled "Homestead." (Id). Indianola continues through that intersection and ends at another perpendicular street labeled "Poland." (*Id.*). There are no streets intersecting with Indianola between those labeled "Homestead" and "Poland" on the diagram. (*Id.*). Stop signs are indicated by a circle at each intersection. (*Id.*). Viewed in conjunction with Government's Exhibit 2 and Defense Exhibit 1, Officer Patton's diagram indicates that he was actually describing the intersection of Indianola and Homewood, which he incorrectly labeled as "Homestead" on the diagram.

Deputy Sheriff McLaughlin also testified on cross examination at the April 30 hearing that the stop sign violation occurred at the intersection of Indianola and Homestead. (Tr. at 22). He identified the intersection of Indianola and Homestead on a map of the area, and confirmed that the violation occurred at that intersection. (Tr. at 26). On redirect examination, however, Deputy Sheriff McLaughlin was asked to estimate the distance between the intersection of Indianola and Homestead and the location of the traffic stop on Center Street. He gave the following response:

> Well, by the time I could get behind [the Defendant], you have to remember Indianola runs downhill into Poland Avenue, and then by the time we could get behind him, from Homestead to the bottom then there is, I don't know, couple hundred feet. It's not very far at all. And then right on to Poland Avenue, left on

to Center Street where I was able to effectively execute a traffic stop.

(Tr. at 27). Deputy Sheriff McLaughlin's testimony that the distance between the intersection where the violation occurred and the bottom of Indianola is "not very far at all" simply does not describe the intersection of Indianola and Homestead, which is more than three-quarters of a mile west of the bottom of Indianola. (*See* Gov't Ex. 2; *see also* Def. Ex. 1). The officer's description of the location matches that of the intersection of Indianola and Homewood, which is a "couple hundred feet" from the bottom of Indianola, where the Defendant turned "right on to Poland Avenue." (*Id.*).

Finally, Magistrate Judge Limbert found that Officer Patton's testimony lacked credibility "because [he] testified that he visited the intersection of Homestead and Indianola following the first suppression hearing and concluded that he could not have observed the stop sign violation there because the intersection is controlled by a traffic light instead of a stop sign." (Dkt. # 42 at 8). Because the evidence shows that no traffic light exists at the intersection of Indianola and Homestead, the Magistrate Judge determined that such an inaccuracy calls the officer's entire testimony into question. A review of Officer Patton's testimony from the May 5 hearing, however, demonstrates that Officer Patton did not testify that he revisited the intersection of Indianola and Homestead. Rather, Officer Patton gave the following testimony on direct examination:

Q And at the [April 30 hearing] you testified that there had been a moving violation, a stop sign violation involving the defendant's vehicle at the intersection of Indianola and Homestead Avenue; is that correct?

A That's correct.

Q And what did you do in relation to that?

A In relation to that I was able to determine that the Homestead was actually Homewood, and it was improperly reflected in the reports that were generated from the traffic stop and from the arrest that occurred after the traffic stop.

Q Did you actually go out to the scene last week to see where the area was *where you had observed the moving violation* involving the defendant's vehicle?

A That's correct. As soon as I left the courtroom.

Q Is that when you noted the error?

A That's correct.

Q Okay. Is there a stop sign on the intersection of Indianola and Homewood Avenue?

A There is.

Q Is there a traffic light on the intersection of Indianola and Homestead Avenue?

A I believe so, yes.

(Tr.II at 4–5)(emphasis added). Officer Patton was asked again on cross-examination about a traffic light at the intersection of Indianola and Homestead:

Q You indicated that there is a traffic light at the intersection of Homestead and Indianola?

A I said I believe so.

(Tr.II at 8). Officer Patton's testimony from the May 5 hearing demonstrates only that he returned to the location where he observed the stop sign violation, which the record shows was actually the intersection of Indianola and Homewood. The officer's testimony does not indicate, however, that he returned to the intersection of Indianola and Homestead, where he did not observe a violation. Furthermore, Officer Patton did not specify that he visited Indi-

anola and Homestead to confirm the existence of a traffic light at that intersection, nor that the existence of such a traffic light helped him to realize the error in his earlier testimony.[2]

Upon a *de novo* review of the record, the Court finds that the inaccuracies in the testimony of Officer Patton, Deputy Sheriff McLaughlin, and Officer Pantall do not render such testimony not credible. The primary inaccuracy in the officers' testimony was the name of the intersection where Officer Patton observed the stop sign violation. However, the descriptions given by Officer Patton and Deputy Sheriff McLaughlin of the intersection at which the violation occurred and of the events leading to the traffic stop demonstrate by a preponderance of the evidence that Officer Patton observed a traffic violation, namely a stop sign violation, at the intersection of Indianola Avenue and Homewood Avenue. That observation provided probable cause to perform a traffic stop of the Defendant's vehicle. *See Whren*, 517 U.S. at 809–810, 116 S.Ct. 1769.

Based upon the foregoing, the Court DECLINES to adopt the Magistrate Judge's recommendation that the Court find that the officers lacked probable cause to stop the Defendant's vehicle for a traffic violation.

**2. Officer Pantall's discovery of marijuana and currency in the trunk of the Defendant's vehicle was valid under the plain view exception to the warrant requirement of the Fourth Amendment.**

Having found that the traffic stop of the Defendant's vehicle was supported by probable cause, the Court must determine whether the subsequent search of the vehicle was reasonable under the Fourth Amendment. As Magistrate Judge Limbert noted, the search of the Defendant's vehicle arose from the discovery of marijuana and currency in the trunk of the vehicle during the traffic stop. The Magistrate Judge concluded that no Fourth Amendment violation occurred in Officer Pantall's viewing the marijuana and currency. The Court agrees with the Magistrate Judge's determination.

▉▉▉▉ "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). For the police to conduct a valid plain view search, two requirements must be met: "(1) the incriminating nature of the item in plain view must be 'immediately apparent,' and (2) the officer must be lawfully located in a position from which he or she can plainly see the item and have lawful access to it." *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir.1996) (citing *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)); *see United States v. Riascos–Suarez*, 73 F.3d 616, 625 (6th Cir.1996) ("A search and seizure is valid if an officer sees an incriminating object while lawfully standing in an area from which the object is plainly visible."). *See also United States v. Walker*, 181 F.3d 774, 779 (6th Cir.1999) ("The rationale of the plain-view doctrine is that if contraband is left in open view

---

**2.** The Court notes, as did the Magistrate Judge's report and recommendation, that the Government's Motion to Reopen Suppression Hearing Testimony indicates that, upon revisiting the area of the traffic violation, Officer Patton realized that the intersection of Indianola and Homestead is controlled by a traffic light. (Dkt. # 34 at 2). Nevertheless, neither Officer Patton's testimony nor any other evidence before the Court indicates that Officer Patton returned to Indianola and Homestead to verify the existence of a traffic light, or that the officer relied on such facts in correcting his earlier testimony.

and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment.").

Based upon the foregoing, the Court finds that Officer Pantall's discovery of marijuana and currency in the trunk of the Defendant's vehicle was valid under the plain view exception to the warrant requirement of the Fourth Amendment. First, the incriminating nature of the items was immediately apparent. Both officers testified that the marijuana and currency were immediately visible without moving anything in the trunk, and that the marijuana was in a plastic bag and readily identifiable based upon the officers' law enforcement experience. (Tr. at 21, 32). Officer Pantall also testified that he detected the odor of marijuana when the trunk was opened. (Tr. at 31). Furthermore, the proximity of the currency to the marijuana made the incriminating nature of the currency apparent.

Next, Officer Pantall was lawfully in a position to view the contraband in the trunk and to have access to it. Officer Pantall testified, and the Defendant does not dispute, that he observed the marijuana and currency when the Defendant opened the trunk of his vehicle in order to retrieve his driver's license. (Tr. at 31–32). According to the testimony of both Officer Pantall and Deputy Sheriff McLaughlin, Officer Pantall was positioned at the rear of the vehicle, behind the Defendant when the Defendant opened the trunk. (Tr. at 20, 31). Because the officers had approached the vehicle as part of a traffic stop which was supported by probable cause, Officer Patton was lawfully in such a position, and his discovery of contraband in the trunk of the Defendant's vehicle falls under the plain view exception.

### 3. The search of the Defendant's vehicle was lawful under the automobile exception to the warrant requirement of the Fourth Amendment.

"[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband." *United States v. Ross*, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Thus, a warrantless search of an automobile is valid where an officer has probable cause to believe that the automobile contains items subject to seizure. *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925); see also *Chambers v. Maroney*, 399 U.S. 42, 48–51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). A vehicle search based upon probable cause to believe the vehicle contains contraband is distinct from a warrantless search based upon exigent circumstances. *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982)(per curiam). "A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search." *United States v. Johns*, 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985). The scope of a warrantless vehicle search based upon probable cause extends to "every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825, 102 S.Ct. 2157.

In the instant case, the discovery of marijuana and currency in the trunk of the Defendant's vehicle provided probable cause to believe that the vehicle contained contraband. A warrantless search of the vehicle was, therefore, valid under the automobile exception to the warrant require-

ment of the Fourth Amendment. The officers in the instant case, however, did not conduct a search at the scene of the traffic stop because of heavy traffic on the Center Street bridge at 3:00 p.m. when the stop was conducted. (Tr. at 33). Instead, Officer Pantall drove the vehicle to the Task Force office to be searched prior to being impounded. (Tr. at 33). Magistrate Judge Limbert found that the testimony failed to establish when the vehicle was searched once it was moved to the Task Force office, and that the search was invalid absent evidence that it occurred in a timely fashion. (Dkt. # 42 at 16–17).

The Supreme Court of the United States has specifically rejected temporal restrictions on automobile searches based upon probable cause to believe a vehicle contains contraband. *Johns*, 469 U.S. at 484, 105 S.Ct. 881. In reversing a Ninth Circuit ruling that a warrantless automobile search was invalid because it did not occur immediately as part of a vehicle inspection or soon thereafter, the Court stated, "Neither *Ross* nor our other vehicle search cases suggest any such limitation." *Id.* The Court in *Johns* upheld a vehicle search by Drug Enforcement Agency officers where the search was supported by probable cause but did not occur until three days after the vehicles were seized and had been transported one hundred miles to DEA headquarters, where the packages to be searched were removed

and placed in DEA storage prior to being searched. *Id.* The Court explained that "[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *Id.* (citing *Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975)(per curiam)).[3]

██ Based upon the foregoing, the search of the Defendant's vehicle in the instant case was valid under the automobile exception to the warrant requirement of the Fourth Amendment. Having discovered marijuana and currency, the officers had probable cause to believe that the vehicle contained contraband. In addition, because of heavy traffic at the location of the stop, it was not unreasonable for the officers to move the vehicle to the Task Force office prior to conducting the search. *See Chambers*, 399 U.S. 42, 52 n. 10, 90 S.Ct. 1975 (noting that it was not unreasonable for officers to move a vehicle to the station house prior to search, where the vehicle was seized in a dark parking lot in the middle of the night). The absence of specific testimony regarding when the search was conducted does not render the automobile exception inapplicable.[4]

### 4. Conclusion

For the foregoing reasons, the Court **DECLINES** to adopt Magistrate Judge Limbert's report and recommendation with respect to the Defendant's Motion to

---

3. In his report and recommendation, Magistrate Judge Limbert cites the Fifth Circuit's decision in *Barnett v. United States*, 384 F.2d 848, 860–61 (5th Cir.1967) for the proposition that a warrantless vehicle search must be conducted in a timely fashion. The Court in *Barnett* specifically noted, however, that "[t]he state officers did not have probable cause to believe the vehicle contained contraband subject to seizure; a search of a moving vehicle may not be conducted on mere suspicion." *Id.* Therefore, the search in that case did not fall under the automobile exception.

*Barnett* is thus distinguishable from the instant case.

4. The Court notes that Magistrate Judge Limbert determined that the search of the Defendant's vehicle could not be justified as an inventory search because of the absence of testimony describing Task Force inventory search procedures. Because the Court finds that the search was valid under the automobile exception, it is not necessary to reach the validity of the search as an inventory search.

Suppress Evidence related to Count 1 of the Indictment. (Dkt. # 42). Rather, the Court finds by a preponderance of the evidence that the traffic stop of the Defendant's vehicle was supported by probable cause to believe that a traffic violation had occurred, and that the subsequent search of the vehicle was valid under the automobile exception to the warrant requirement of the Fourth Amendment. Therefore, suppression of the evidence discovered in the course of the search of the Defendant's vehicle is not warranted.

Therefore, the Defendant's Motion to Suppress Evidence related to Count 1 of the Indictment is hereby **DENIED.** (Dkt. # 17).

### III. MOTION TO SUPPRESS EVIDENCE RELATED TO COUNT 2 OF THE INDICTMENT

The Court has reviewed the report and recommendation of the Magistrate Judge with respect to the Defendant's Motion to Suppress Evidence related to Count 2 of the Indictment *de novo,* and finds that it is well-supported. Furthermore, the Court has reviewed the Government's objections to the report and recommendation with respect to the Defendant's Motion to Suppress Evidence related to Count 2 of the Indictment and finds that they are without merit.

Therefore, Magistrate Judge Limbert's report and recommendation regarding the Defendant's Motion to Suppress Evidence related to Count 2 of the Indictment is hereby **ADOPTED.** (Dkt. # 42). The Defendant's Motion to Suppress Evidence related to Count 2 of the Indictment is hereby **GRANTED.**

### IV. CONCLUSION

Based upon the foregoing, the Court hereby **DECLINES** in part and **ADOPTS** in part the report and recommendation of Magistrate Judge Limbert. (Dkt. # 42). The Court **DECLINES** to adopt the Magistrate Judge's report and recommendation with respect to the Defendant's Motion to Suppress Evidence related to Count 1 of the Indictment. Said Motion is hereby **DENIED.** (Dkt. # 17).

The Magistrate Judge's report and recommendation is **ADOPTED** with respect to Defendant's Motion to Suppress Evidence related to Count 2 of the Indictment. Said Motion is hereby **GRANTED.** (Dkt. # 23).

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

GEORGE J. LIMBERT, United States Magistrate Judge.

The above-captioned case is before the Court on Defendant's Motions to Suppress Evidence. ECF Dkt. # 17, 23. The Honorable Peter C. Economus referred the matter for a report and recommendation. ECF Dkt. # 27.

For the following reasons, the undersigned RECOMMENDS that the Court GRANT both of Defendant's motions:

### I. PROCEDURAL HISTORY

On November 27, 2007, the Government filed an Indictment charging Defendant with two violations of 18 U.S.C. § 922(g)(1), which prohibits the possession of a firearm in or affecting commerce by any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year. ECF Dkt. # 1; 18 U.S.C. § 922(g)(1). On December 10, 2007, Defendant entered a plea of not guilty to the charges in the Indictment.

On February 19, 2008, Defendant filed a motion to suppress evidence pertaining to

Count 1 in the Indictment. ECF Dkt. # 17. On February 28, 2008, Defendant filed a second motion to suppress, this time challenging evidence pertaining to Count 2 in the Indictment. ECF Dkt. # 23. On March 11, 2008, the Government filed a response to both motions. ECF Dkt. # 25. On March 17, 2008, Judge Economus referred the case to the undersigned for a report and recommendation on the suppression motions. ECF Dkt. # 27.

On April 30, 2008, the undersigned conducted a hearing on the matter. On May 1, 2008, the Government filed a motion seeking to reopen the suppression hearing, indicating that one of the witnesses had made a mistake in his testimony. ECF Dkt. # 34. The undersigned granted the Government's motion and conducted a second hearing on the matter on May 5, 2008. ECF Dkt. # 39. On May 7, 2008, Defendant filed a memorandum of law on the merits of his motions. ECF Dkt. # 40. On May 8, 2008, the Government filed a response. ECF Dkt. # 41.

## II. DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED IN COUNT 1.

### A. SUMMARY

In the case at bar, police effected a traffic stop on a vehicle driven by Defendant. During the stop, they observed marijuana and a significant amount of United States currency in the trunk. The police arrested Defendant and transported his vehicle to the Task Force Office where they found a handgun underneath the driver's seat.

For the reasons articulated below, the undersigned recommends that the Court find that certain testimony by Government witnesses is not credible. Consequently, the Government has failed to prove by a preponderance of the evidence that the traffic stop was based on probable cause.

The undersigned further recommends that the Court find that the search conducted at the Task Force Office cannot be justified as a search incident to arrest, a search under exigent circumstances, or an inventory search because the Government has not established the proximity of the search to the scene of arrest or that the officer who found the handgun complied with standardized inventory procedures.

Accordingly, the undersigned ultimately recommends that the Court grant Defendant's first motion to suppress evidence.

### B. SYNOPSIS OF THE FACTS

The testimony received pertaining to the first issue can be summarized as follows:

Officer Robert Patton of the Youngstown Police Department ("Y.P.D.") testified that he was involved in a controlled narcotics purchase on October 4, 2007. Transcript of April 30, 2008 Suppression Hearing ("Tr.") at 4–5. He testified that the target of the investigation met with a police source who purchased some marijuana with $2,000 of police-issued buy money. Id. at 6. Officer Patton testified that the target arrived at the buy scene in a green Lincoln. Id. at 5. Officer Patton observed the green Lincoln approximately fifteen to twenty minutes later traveling eastbound on Indianola Avenue in Youngstown. Id. at 9. He testified that he observed the vehicle fail to come to a complete stop at the intersection of Homestead and Indianola. Id. at 10. At that point, Officer Patton radioed Officer Pantall and Officer McLaughlin in a take-down vehicle. Id. He informed them that the Lincoln had failed to make a complete stop at Homestead, and he instructed them to stop the vehicle. Id. Officer Patton testified that he observed them effect the traffic stop. Id. He also testified that he observed Defendant and Officer Pantall go to the trunk

of the vehicle where Officer Pantall handcuffed Defendant. *Id.* at 11. Officer Patton then approached Defendant, transported him back to the Task Force Office, advised him of his *Miranda* rights, obtained a waiver, and sought his cooperation for further investigations. *Id.* at 11–12. Officer Patton testified that he was not aware of any firearm being found in Defendant's vehicle until Officer Pantall drove the vehicle from the site of the traffic stop to the Task Force Office and later informed Officer Patton that he had discovered a firearm. *Id.* at 13.

On cross examination, Officer Patton confirmed that the traffic violation occurred at the intersection of Homestead and Indianola. Tr. at 14. He further testified that one of the officers wrote a warning indicating that the violation occurred at the intersection of Homestead and Indianola. *Id.* On redirect examination, he testified that Poland Avenue was the next intersection after Homestead. *Id.* at 15.

Next, Mahoning County Deputy Sheriff Lawrence McLaughlin testified. He stated that he was in the take-down vehicle with Officer Pantall and he stopped the green Lincoln after Officer Patton observed a traffic violation. Tr. at 18–19. Officer McLaughlin testified that he made the stop on the Center Street Bridge at approximately 3:00 PM and he found two males in the car. *Id.* He asked Defendant for his driver's license, insurance card, and registration card. *Id.* at 19–20. According to Officer McLaughlin, Defendant said his license was in the trunk and he offered to exit the vehicle to retrieve it. *Id.* at 20. Officer McLaughlin stayed at the driver's side while Officer Pantall accompanied Defendant to the trunk. *Id.* Once the trunk was open, Officer McLaughlin was able to observe marijuana in a plastic bag and United States currency. *Id.* at 21. He

testified that he did not have to touch the bag in order to determine that it was marijuana. *Id.*

On cross examination, Officer McLaughlin confirmed that Officer Patton had advised him that Defendant ran a stop sign at Homestead and Indianola. Tr. at 22. Officer McLaughlin further testified that he did not see the traffic violation. *Id.* at 23. Defense counsel presented a map and asked Officer McLaughlin to indicate where Homestead Avenue was on the map. *Id.* at 24; Def. Ex. 1. Officer McLaughlin pointed out the street and indicated that it was the intersection next to Homestead Park. *Id.* at 26. On redirect examination, Officer McLaughlin confirmed that it was the street labeled in blue ink. *Id.* at 27; *see* Def. Ex. 1.

Officer Jeff Pantall of the Struthers Police Department testified that he was present in the take-down vehicle, and that he and Officer McLaughlin stopped the green Lincoln because it "rolled" a stop sign at Homestead and Indianola. Tr. at 29, 30. After he and Officer McLaughlin stopped the Lincoln, Officer Pantall approached the rear of the vehicle, on the passenger side. *Id.* at 31. He accompanied Defendant to the trunk to retrieve Defendant's driver's license. *Id.* When Defendant opened the trunk, Officer Pantall observed a row of cash strewn across the back of the trunk. *Id.* at 31. He testified that he smelled marijuana and observed an open white plastic shopping bag containing marijuana. *Id.* Officer Pantall testified that he did not have to touch or open the bag to observe the marijuana. *Id.* Officer Pantall then arrested the driver. *Id.* at 33. By that time, more units had arrived to transport Defendant to the Task Force Office. *Id.* Officer Pantall drove the Lincoln to the Task Force Office where it was searched. *Id.* at 33. An inventory search revealed a .40 caliber Smith and Wesson semi-auto-

matic handgun under the front seat with Defendant's driver's license. *Id.* at 33–34.

Following the Government's case in chief, Defendant called Gerald Salter to testify. Mr. Salter testified that he was at Defendant's house on October 4, 2007 tuning Defendant's car and changing the oil. Tr. at 37–38. When he finished, Defendant began to drive him home. *Id.* at 38. Mr. Salter testified that Defendant was driving eastbound on Indianola and crossed Homestead. *Id.* Mr. Salter, further testified that Defendant could not have run a stop sign at Homestead and Indianola because there is no stop sign controlling traffic eastbound on Indianola at that intersection. *Id.* at 40. Mr. Salter also testified that he accompanied defense counsel as he drove the route from Defendant's house on Volney to the site of the traffic stop on the Center Street Bridge, stopping at the intersection of Indianola and Homestead to take photographs. *Id.* at 41–44. Defendant introduced the photographs that Mr. Salter and defense counsel had taken of the intersection. Def. Ex. 2–5. Mr. Salter testified that the photographs show that stop signs at that intersection regulate traffic on Homestead but not on Indianola. Tr. at 41–44. As a lifelong resident of the area, Mr. Salter testified that he knows Indianola to be a "main drag" and he cannot recall a time when there was an eastbound stop sign on Indianola at the Homestead intersection. *Id.* at 37, 41.

The Government called Officer Patton in rebuttal. He again testified that Defendant made a "rolling stop" at the intersection of Indianola and Homestead. Tr. at 51. He testified that he was not able to tell from Defendant's photographs which direction the stop signs were facing. *Id.* Officer Patton then drew a diagram of the intersection and indicated that there was an eastbound stop sign on Indianola at

Homestead. Tr. at 53; Gov't Ex. 1. He testified that a person traveling eastbound would arrive at "another intersection" with a stop sign at Poland Avenue. *Id.* at 54.

Following the April 30, 2008 suppression hearing, the Government moved the Court to reopen the hearing in order for Officer Patton to change his testimony. ECF Dkt. # 34 at 3. The Government asserted that Officer Patton revisited the scene of the traffic stop following the April 30, 2008 suppression hearing. *Id.* at 2. Thereafter, Officer Patton apparently realized that the intersection to which he was referring in the hearing was actually Homewood Avenue, not Homestead Street, which is located three quarters of a mile away and is controlled by a traffic signal. *Id.* The undersigned granted the motion. ECF Dkt. # 39.

At the May 5, 2008 suppression hearing, the Government called Officer Patton. He testified that he reviewed his testimony and determined that he must have observed the traffic violation occur at Homewood Avenue, not Homestead Street. He claimed that he returned to the scene following the April 30, 2008 hearing and observed a stop sign at the intersection of Homewood and Indianola. He testified that the stop sign regulated traffic traveling eastbound on Indianola. Officer Patton explained that he had visited the intersection of Indianola and Homestead and observed a traffic light; therefore, he was sure that he had observed Defendant commit a traffic violation at the intersection of Homewood and Indianola. Officer Patton recognized that a warning report indicated that the violation had occurred at Homestead Street, but he stated that Officer McLaughlin had completed the warning report.

On cross examination, Defendant produced several photographs of the Homestead and Indianola intersection demon-

strating that the intersection has no traffic lights. Def. Ex. 12–14. Officer Patton responded that he must have been mistaken when he testified that there was a traffic light at Homestead and Indianola.

## C. FOURTH AMENDMENT ANALYTICAL FRAMEWORK

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment applies to state actors through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The remedy for a violation of the Fourth Amendment is exclusion of the improperly secured evidence and all evidence obtained as a result of the violation. *Id.; Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right jus-

tifying suppression." *United States v. Feldman*, 606 F.2d 673, n. 11 (6th Cir. 1979). "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334, (1993). Therefore, a defendant's showing that a warrantless search has occurred generally constitutes a prima facie showing of illegality, and the Government has the burden of showing that an exception applies. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir.2007). The Government must show by a preponderance of the evidence that the search and seizure was reasonable. *United States v. Matlock*, 415 U.S. 164, n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

## D. ANALYSIS

Police conducted multiple searches affecting Defendant's privacy interests on October 4, 2007. There are three points that raise issues as to whether police had justification for their warrantless intrusions: (1) the traffic stop; (2) the search of the trunk of Defendant's vehicle; and (3) the search of the passenger compartment of the vehicle. More specifically, the undersigned will address the following Fourth Amendment issues in this case: [1,2]

1. The undersigned notes that a Defendant must demonstrate standing to assert a Fourth Amendment violation. *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). A defendant must satisfy a two-part test to establish standing: (1) has the individual manifested a subjective expectation of privacy in the object of the challenged search? and (2) is society willing to recognize that expectation as reasonable? *Minnesota v. Olson*, 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) citing *Katz v. United States*, 389 U.S. 347, 360–61, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J.,

concurring). The Government does not challenge standing. *See* ECF Dkt. # 25. For the sake of completeness, the undersigned notes that an owner of a vehicle has standing to challenge a traffic stop and a search of the vehicle. *Rakas v. Illinois*, 439 U.S. 128, 168–69, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Defendant was the owner of the vehicle searched in this case.

2. The undersigned will not address the issue of whether Officer McLaughlin was entitled to stop Defendant's vehicle based upon probable cause to believe Defendant was involved in

1. Did Officer McLaughlin have probable cause to stop Defendant's vehicle?

2. Did Officer Pantall improperly search the trunk of Defendant's vehicle?

3. Can the subsequent search of Defendant's vehicle be justified as a search incident to arrest?

4. Can the subsequent search of Defendant's vehicle be justified by exigent circumstances?

5. Can the subsequent search of Defendant's vehicle be justified as an inventory search?

If any of the above searches were inappropriate, the Court must then determine if derivative evidence must also be suppressed pursuant to *Wong Sun*, 371 U.S. at 484–85, 83 S.Ct. 407.

### (i) The October 4, 2007 traffic stop was not based upon probable cause.

The first issue in the case at bar is whether Officer McLaughlin violated the Fourth Amendment in stopping Defendant's vehicle without an articulable basis for probable cause.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States,*

517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Therefore, an automobile stop is subject to the Fourth Amendment requirement for reasonableness. *Id.* at 810, 116 S.Ct. 1769. A police officer effecting at traffic stop must have probable cause to believe that a traffic violation has occurred. *Id.* The officer's subjective intentions in stopping the vehicle play no role in ordinary, probable cause Fourth Amendment analysis. *Id.* at 813, 116 S.Ct. 1769.

Here, Officer Patton testified that he observed Defendant run a stop sign at Homestead and Indianola. He instructed Officer McLaughlin and Officer Pantall to stop the vehicle based upon the violation at Homestead and Indianola. He later testified that he visited the scene and realized that he had observed the violation occur at Homewood, not Homestead.

The undersigned finds Officer Patton's testimony not to be credible because Officer Patton testified that he visited the intersection of Homestead and Indianola following the first suppression hearing and concluded that he could not have observed the stop sign violation there because the intersection is controlled by a traffic light instead of a stop sign. Upon review of Defendant's Exhibits 2–5, the undersigned concludes that the intersection of Homestead and Indianola is controlled by stop signs on Homestead; no traffic lights are present at the intersection. The Govern-

the controlled narcotics purchase that occurred earlier that day. The Parties have not raised the issue. *See* ECF Dkt. # 17, 23, 25, 40, 41. In this case Officer Patton testified that he observed the green Lincoln participate in the controlled narcotics purchase, but then he left to meet with his cooperating source and did not see the vehicle until fifteen to twenty minutes later. Tr. at 4–9. While Officer Patton claimed it was the same green Lincoln, he failed to articulate a basis for that conclusion. *See id.* at 9. For example, he did

not testify that he observed the same license plate or that his surveillance team reported that it was the same vehicle. *See Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring an articulable basis for a stop). Further, Officer Patton did not testify as to how he knew that transaction he witnessed was actually a narcotics purchase (*i.e.,* did the cooperating source actually receive marijuana for the buy money?). He testified only that "The transaction was concluded." Tr. at 5.

ment contends that the issue is irrelevant because the traffic violation actually occurred at Homewood. ECF Dkt. # 41 at 2. The issue is, however, quite relevant in determining Officer Patton's credibility and the reasonableness of Officer McLaughlin and Pantall's mistake of fact, as discussed below.

Officer Patton's inaccuracy in describing the intersection of Homestead and Indianola based upon an investigation he had undertaken the previous day [3] calls his entire testimony into question. Based upon the evidence of record, there clearly is no traffic light at Homestead and Indianola. Furthermore, there is no evidence to show that the intersection has changed since Gerald Salter took his photographs showing that the intersection is controlled by stop signs on Homestead. Therefore, the undersigned affords greater weight to the photographic evidence and questions whether Officer Patton truly did return to the scene to investigate. When confronted on cross examination with photographs of the intersection, Officer Patton explained that he must have been mistaken. Officer Patton's errors and his explanation are inexcusable in light of his claim that he visited the intersection less than one week earlier and the fact that he reported his results to the Assistant United States Attorney the next day. See ECF Dkt. # 34. The undersigned is deeply troubled that a police officer would testify under oath in such a reckless manner.

Furthermore, Officer Patton had ample opportunity at the first suppression hearing to correct his testimony, or at least notify the Court of the potential error. At the initial suppression hearing, the Gov-

ernment called Officer Patton on redirect examination and questioned him about the photographs of the intersection at Homestead and Indianola. See Tr. at 51. Officer Patton did not express any indication that the photographs were of the wrong intersection. Id. Officer Patton was questioned at length about the name and description of the intersection during his initial testimony and his rebuttal testimony. At any point, he could have indicated that he was unsure of the name of the street in question, but he did not express any doubt. These factors undermine his claim that he was mistaken about the name of the street where the violation occurred.

Admittedly, some of Officer Patton's original testimony corroborates his revised testimony that the traffic offense occurred at Homewood. Officer Patton testified that Poland Avenue was the "next intersection" following Homestead, and maps of the area indicate that Poland Avenue is actually the next intersection following Homewood. He also testified that he observed the violation after Defendant had crossed the 680 overpass, which is consistent with Government Exhibit 2. This testimony, however, is insufficient to outweigh the other factors calling Officer Patton's credibility into question.

Based on the foregoing, the undersigned concludes that Officer Patton's testimony is not credible. Therefore, the undersigned recommends that the Court find that his testimony fails to establish by a preponderance of the evidence that he actually observed a traffic violation occur.

Even if the Court were to find Officer Patton to be credible, his testimony is, at the very least, too uncertain to establish

---

**3.** The Government filed its Motion to Reopen Suppression Hearing Testimony on May 1, 2008—the day after the April 30, 2008 suppression hearing. The Government's motion indicated that Officer Patton would testify to the intersection of Homestead and Indianola being regulated by a traffic light. His testimony on May 5, 2008 was consistent with the Government's representation.

probable cause by a preponderance of the evidence because it remains highly questionable *where* the alleged traffic violation actually occurred. Two other police officers testified that Officer Patton reported the violation occurring at Homestead and Indianola. The warning report also indicates that the violation occurred at Homestead. Def. Ex. 15. Officer Patton's description of the intersection is also not illuminating. Officer Patton testified that Homestead runs parallel to Poland Avenue. Tr. at 15. He also testified that Homestead and Indianola are parallel, but they also intersect. *Id.* at 16–17. The issue is whether Officer Patton was truly mistaken in his description and was actually referring to Homewood Avenue. Looking at Government's Exhibit 2, the features that Officer Patton described no better describes Homewood than Homestead. Both streets are approximately parallel to Poland Avenue, as he described, but neither is parallel to Indianola as he claimed. Therefore, the undersigned recommends that the Court find Officer Patton's description of the intersection to be equivocal and inconsequential.

In this case, Officer Patton's failure to articulate a basis for probable cause taints the traffic stop effected by Officer McLaughlin. This Court has held that, "[w]hile it is true that an officer generally is entitled to rely on a report from another officer under the 'collective knowledge' doctrine or 'fellow officer' rule, the Supreme Court has explained that even objectively reasonable reliance on erroneous or flawed information does not cleanse an otherwise unconstitutional search or seizure." *United States v. Anderson,* No. 4:07cr0023, 2007 WL 4732033 at *5 (N.D.Ohio June 21, 2007) (internal citations omitted). Therefore, "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating

officer to rely on fellow officers to make the arrest." *Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1985).

For example, in *Anderson,* this Court considered a case on the following facts: a man reported that his car was stolen; two hours later he reported that the car had been recovered; the reporting officer "cleared" the stolen vehicle report from the Ohio LEADS system; at a briefing for the midnight shift for the Youngstown Police Department, the highest ranking officer advised other officers to be on the look out for the car; upon belief that the car was still missing; a police officer stopped the car based upon the superior officer's report; and the officer searched the occupants and found a loaded handgun on one of the passengers who had been previously convicted of a felony. *Anderson,* 2007 WL 4732033 at *1–*2. This Court suppressed the firearm because the arresting officer was not entitled to rely on his superior officer's erroneous belief that the vehicle was still missing. *Id.* at *5–*6.

In *Whiteley,* a sheriff signed a criminal complaint against a suspect based solely on an informant's tip that the suspect had robbed a bar. *Whiteley,* 401 U.S. at 564–65, 91 S.Ct. 1031. The sheriff's department put a bulletin out on the radio that resulted in other officers arresting the suspect. *Id.* at 563–64, 91 S.Ct. 1031. The United States Supreme Court held that the sheriff who signed the complaint did not have probable cause based on the tip alone, and that error rendered the subsequent arrest by other officers unconstitutional. *Id.* at 566–69, 91 S.Ct. 1031.

Likewise, in *United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court held that "if a flyer or bulletin has been issued on the basis of articulable facts

supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information [, but] *[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.*" (Emphasis added).

Based on the holdings in *Anderson* and *Whiteley* and the dicta in *Hensley*, the undersigned recommends that the Court find that Officer Patton's error infected Officer McLaughlin's basis for probable cause and renders that traffic stop unconstitutional.

Officer McLaughlin's basis for probable cause is further called into question by Gerald Salter's testimony that, for as long as he can recall, Indianola did not have an eastbound stop sign at the intersection with Homestead. The undersigned does not believe the testimony of Officers Patton, McLaughlin, and Pantall because none of them realized that it was impossible to travel eastbound on Indianola and run a stop sign at Homestead. Officer Patton has been an officer for the Y.P.D. for twenty-seven years, Officer McLaughlin has been a deputy sheriff in Mahoning County for nine years, and Officer Pantall has been a police officer in Struthers[4] for thirty-three years. With sixty-nine years of combined experience patrolling the area, not one officer realized that there is no eastbound stop sign at Indianola and Homestead. Yet, a lay witness who has lived in the area his whole life and who is familiar with Indianola as a "main drag" testified that there has not been a stop sign at that location for as long as he can

remember. Furthermore, this intersection is apparently unique because it is near Homestead Park. Tr. at 26. The undersigned cannot believe that all three officers failed to detect the alleged error.

Indeed, the officers were operating under the urgencies common to police work. As Defendant notes, however, this "error" went uncorrected for over seven months. Therefore, the undersigned recommends that the Court find that Officer Patton, McLaughlin, and Pantall's testimony with regard to the name of the intersection is not credible.

In some instances, an objectively reasonable mistake of fact may cure an error in probable cause. *See United States v. Leon,* 468 U.S. 897, 930–31, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (physical evidence seized by police officers reasonably relying upon a warrant issued by a detached and neutral magistrate is admissible in the prosecution's case in chief, even though a reviewing court has subsequently determined that the warrant was defective); *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

The Court, however, need not determine if this is one of those cases where a reasonable mistake excuses an actual lack of probable cause because the error in this case was not reasonable. The undersigned finds it unreasonable for these three seasoned police officers to fail to notice that it was impossible for Defendant to run a stop sign that clearly does not exist. There-

---

**4.** Struthers is a municipality near the area where the events at issue in this case oc-

curred. *See* Gov't Ex. 2.

fore, even if the undersigned were to credit the testimony of Officers Patton, McLaughlin, and Pantall, that testimony still fails to establish an articulable basis in probable cause due to the unreasonable nature of the mistake.

While the undersigned believes the foregoing discussion is sufficient to find that the Government has not carried its burden, the undersigned further notes that the overall reliability of Officer McLaughlin and Officer Pantall's testimony is weakened due to contradiction. Officer McLaughlin testified that he observed marijuana in Defendant's trunk in a clear Ziploc baggie. Tr. at 21. Officer Pantall, however, testified that the marijuana was in a white plastic shopping bag, such as one that a store would use to package a gallon of milk and some potato chips. *Id.* at 31–32. Such a discrepancy is understandable since the traffic stop occurred approximately seven months ago. This discrepancy, however, further undermines the reliability of other reported details associated with the traffic stop, such as the name of the intersection at which the alleged traffic violation occurred.

For the foregoing reasons, the undersigned recommends that the Court grant Defendant's first motion to suppress and suppress all evidence seized following the traffic stop on October 4, 2007. ECF Dkt. # 17. If the Court should adopt this recommendation, further analysis is unnecessary due to the derivative evidence rule set forth in *Wong Sun.* Should the Court decide to reject this recommendation, however, it should proceed through the analysis that follows.

### (ii) Officer Pantall observed the marijuana and currency in the trunk of Defendant's vehicle in plain view.

Since the basis for all the subsequent searches in this case arises from the discovery of marijuana in Defendant's trunk, the next question is whether Officer Pantall committed any Fourth Amendment violations in observing the marijuana.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Four conditions must be present before police may seize an item pursuant to the plain view doctrine: (1) the item must be in plain view; (2) the item's incriminating nature must be immediately apparent; (3) the item must be viewed by an officer lawfully located in a place from which the object can be seen; and (4) the item must be seized by an officer who has a lawful right of access to the object itself. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Jenkins,* 124 F.3d 768, 774 (6th Cir.1997).

In this case, unrefuted testimony establishes that Defendant willfully offered to retrieve his driver's license from the trunk and proceeded to open the trunk lid. At that time, Officer Pantall could smell marijuana, and he could see green vegetable matter in an open bag. Officer Pantall testified that he could determine that the substance was marijuana without touching the bag. Although the undersigned addressed the contradictory testimony regarding the type of bag in which the marijuana was found, the undersigned does believe that Officer Pantall had the best vantage point. Therefore, the undersigned recommends that the Court find that Officer Pantall properly observed the marijuana, without manipulation, while lawfully located behind the vehicle.

Further, Officer Pantall could also determine that the United States currency in

the trunk was incriminating because he was aware that Defendant's vehicle was present at the controlled narcotics buy and the currency was in close proximity to the marijuana. Therefore, the currency was also properly seized under the plain view exception to the warrant requirement.

Should the Court find it necessary to analyze this portion of the search, the undersigned recommends that the Court find no violation in Officer Pantall viewing the marijuana and currency in Defendant's trunk. The Court should then proceed to determine if the Government has established an exception permitting the seizure of the handgun from the passenger compartment of the vehicle. *See infra* §§ II(D)(iii)-(v).

### (iii) The subsequent search of Defendant's vehicle cannot be justified as a search incident to arrest.

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). More specifically, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In *Thornton v. United States*, 541 U.S. 615, 618, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004), the United States Supreme Court held that a police officer could search the passenger compartment of a vehicle even after the officer had handcuffed the driver, informed him that he was under arrest, and placed him in the back seat of a patrol car.

In this case, police arrested Defendant and transported him away from the scene. Then, they drove Defendant's vehicle to the Task Force Office where they found a handgun under the driver's seat. That search, however, is too remote to be justified as a search incident to arrest because both the arrestee and the vehicle had been removed from the scene.

The *Chimel* Court stated that the "justifications [for a search incident to arrest] are absent where a search is remote in time or place from the arrest." *Chimel*, 395 U.S. at 764, 89 S.Ct. 2034. "Once law enforcement officers have reduced ... personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *see also Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). For example, in *United States v. Lugo*, 978 F.2d 631, 635 (10th Cir.1992), the Tenth Circuit Court of Appeals held that police could not search an automobile incident to arrest when the occupant had been transported from the scene.

The search in this case is too remote in distance to be considered a search incident to arrest because there was no appreciable chance that Defendant could access the weapon once he and his vehicle were transported from the scene of arrest. Thus, the search falls outside of the scope contemplated by *Chimel*, *Belton*, and *Thornton*.

Further, the Government failed to establish temporal proximity. The Government offered minimal testimony concerning the

details of the search that resulted in the discovery of the handgun under the driver's seat. The only testimony that the Court has to consider is Officer Pantall's testimony "I took the Lincoln and drove it down to the drug task force, whereupon it was searched once we got it there." Tr. at 33. This statement does not establish the time of the search by a preponderance of the evidence because the Court must speculate as to whether "once we got it there" means that the search occurred immediately or some time later.

Since the Government failed to establish geographical and temporal proximity, the undersigned recommends that the Court find that the search of the interior of the vehicle cannot be justified as a search incident to arrest.

**(iv) The subsequent search of Defendant's vehicle cannot be justified by exigent circumstances (the automobile exception).**

The next question is whether police were entitled to search the interior of the vehicle for evidence based upon probable cause stemming from the marijuana discovered in the trunk and exigent circumstances arising from the mobile nature of a vehicle. As with a search incident to arrest, the main consideration here is whether such a search can be conducted at some indefinite time after police have impounded the vehicle.

A vehicle may be searched without a warrant if an officer has probable cause to believe the vehicle contains contraband. *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the United States Supreme Court held that, if police had probable cause to search a vehicle at the location of a stop, then they are also entitled to search the vehicle at the

stationhouse because the car retains its mobile characteristics unless it can be seized without a warrant and police can deny its use until a warrant is obtained. *See also Texas v. White,* 423 U.S. 67, 68–69, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). Such a search, however, can be rendered unreasonable if it is not effected in a timely fashion. The *Chambers* Court stated that, "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an *immediate search* without a warrant." *Chambers,* 399 U.S. at 52 (emphasis added); *see also United States v. Ross,* 456 U.S. 798, n. 9, 102 S.Ct. 2157, 72 L.Ed.2d 572 ("a *search soon thereafter* [removing the vehicle from the street] at the police station is permissible if the vehicle is impounded.") (1982) (emphasis added). The Fifth Circuit Court of Appeals reversed a district court for failing to suppress evidence seized from an automobile when: the automobile had been transported five miles from the scene of arrest; the search was conducted between twenty minutes and more than an hour after the arrests; and the search was conducted after the arrestees had been booked and put in cells. *Barnett v. United States,* 384 F.2d 848, 860–61 (5th Cir.1967).

In the case at bar, the Government has not established when the search occurred by a preponderance of the evidence. As discussed above, Officer Pantall's testimony on the issue was equivocal. Therefore, the undersigned sees no factual basis for concluding that the search at the Task Force Office occurred immediately after the events on the Center Street Bridge. As a result of the uncertain evidence, the undersigned recommends that the Court find that the Government has failed to

establish that the automobile exception applies.

### (v) The subsequent search of Defendant's vehicle cannot be justified as an inventory search.

Officer Pantall testified that he conducted an inventory search of Defendant's vehicle. His testimony, however, is insufficient to invoke the inventory search exception to the warrant requirement.

"[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *see also Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). Therefore, "inventories pursuant to standard police procedures are reasonable." *Opperman,* 428 U.S. at 372, 96 S.Ct. 3092.

In this case, however, there has been absolutely no testimony describing the Task Force inventory search procedures. Consequently, there was no testimony that Officer Pantall complied with those procedures. As in *Florida v. Wells,* "there was no evidence that an inventory was actually done in this case: [t]he [Government] introduced neither an inventory sheet nor any testimony that the officer actually inventoried the items found in respondent's car." 495 U.S. 1, 6, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (Brennan, J., concurring). In suppressing evidence obtained where police opened a closed container solely for investigatory purposes, the Supreme Court stated that an "inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Wells,* 495 U.S. at 4, 110 S.Ct. 1632 (Rehnquist, J. majority). Here, the relevant testimony is as follows:

[Direct examination of Jeff Pantall]

Q What happens to the vehicle that afternoon?

A We were on the Center Street bridge, traffic was heavy, some more units showed up with the drug task force. It was decided we were going to transport the gentleman and his car down to the drug task force. The passenger, I believe, was checked, had nothing negative. He was sent on his way.

I took the Lincoln and drove it down to the drug task force, whereupon it was searched once we got it there.

Q And was the Lincoln going to be impounded at that point?

A Yes.

Q Did you do an inventory search on it?

A Yes.

Q And you've already described, of course, the marijuana and the cash. Did you know what the significance of the cash and marijuana was relative to what you were out on that day?

A I knew we had bought a significant amount of marijuana and that the target had been transported in that Lincoln.

Q And when you further searched the vehicle, I presume down at the task force office?

A Found a .40 caliber Smith & Wesson handgun, semi-automatic, was under the front seat with his driver's license.

(Tr. at 33–34).

From the foregoing testimony, the undersigned is not able to conclude by a preponderance of the evidence what the Task Force inventory search procedures are or whether Officer Pantall complied with those procedures. The undersigned cannot determine, for example, if Officer Pantall had to remove any panels or lin-

ings under the seat to recover the firearm. The undersigned cannot determine if anything else in the vehicle was inventoried. Presumably the vehicle contained more that a handgun and a driver's license; however, the evidence does not show whether Officer Pantall stopped searching upon discovering the handgun or if he continued to inventory all of the items in the vehicle. The lack of testimony and an inventory sheet raises significant doubt as to whether this search was truly for inventory purposes or a ruse for a general rummaging in order to discover incriminating evidence.

In contrast to the case at bar, the Sixth Circuit upheld an inventory search of a jacket hanging in the back seat of a vehicle because "[t]he search of the jacket was *pursuant to local police procedures* and was necessary to safeguard any valuables contained in its pockets and to safeguard the jacket itself as well as to guard against claims of theft, vandalism, or negligence on the part of the police." *United States v. Ford,* 872 F.2d 1231, 1240 (6th Cir.1989) (emphasis added).

In *United States v. Richards,* 147 F.Supp.2d 786, 789–91 (E.D.Mich.2001), a district court granted a motion to suppress a firearm recovered from a Cadillac. The police had a policy allowing them to impound and inventory a car if police action caused the vehicle to be unattended. *Id.* at 790. The occupant parked the car, turned off the engine and headlamps, and began to walk away from the vehicle before his encounter with police began. *Id.* The court concluded that the police violated their policy by impounding the vehicle. *Id.* at 791. Accordingly, the inventory search of the vehicle was invalid. *Id.*

In light of this precedent, the undersigned recommends that the Court find that the Government has failed to meet its burden of establishing Officer Pantall's compliance with task force inventory procedures, and the inventory exception, therefore, does not apply.

## E. CONCLUSION: FIRST SUPPRESSION MOTION

For the foregoing reasons, the undersigned RECOMMENDS that the Court: ADOPT the proposed findings of fact; FIND that the October 4, 2007 traffic stop was unreasonable; GRANT Defendant's motion; and SUPPRESS all evidence obtained during the stop and as a result of the stop; namely, the Smith and Wesson Model SW40VE, .40 caliber handgun, serial number PBU8056 described in the Indictment and any testimony relating to the handgun.

Should the Court decide that the traffic stop was reasonable, the undersigned RECOMMENDS that the Court find that the search of Defendant's vehicle at the Task Force Office was unreasonable. The undersigned further RECOMMENDS that the Court GRANT Defendant's motion and SUPPRESS all evidence obtained during the search of Defendant's vehicle and as a result of that search; namely, the Smith and Wesson Model SW40VE, .40 caliber handgun, serial number PBU8056 described in the Indictment and any testimony relating to the handgun.

## III. DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED IN COUNT 2.

### A. SUMMARY

On October 24, 2007, police received a report of a shooting on Volney Road in Youngstown. Upon arrival at the scene, police observed a deceased shooting victim lying at 2664 Volney Road. They began to canvass the area and discovered glass on the porch of Defendant's home at 2704 Volney Road. Police observed bullet holes

in the front door. They entered the home without a warrant and found an SKS rifle in a gun case in the attic area of the home.

Although several officers testified as to the events of October 24, 2007, the officer who discovered the firearm did not testify. For the reasons explained more fully below, the undersigned ultimately recommends that the Court grant Defendant's motion to suppress the firearm because the officer who reportedly discovered the firearm in the attic area did not testify at the suppression hearing. Therefore, the Government has not presented sufficient evidence to establish that the firearm was in plain view. *See United States v. Kiyuyung*, 171 F.3d 78, 83–84 (2d Cir.1999) (suppressing firearms discovered during a protective sweep of a residence where the officer who found the firearms did not testify at the pretrial suppression hearing).

## B. SYNOPSIS OF THE FACTS

At the April 30, 2008 suppression hearing, Y.P.D. Officer Kelly Lamb testified that she responded to a stolen vehicle report at 2704 Volney Road. Tr. at 57. She met with Defendant who reported that his dark green 1998 Lincoln Town Car had been stolen from his driveway. *Id.* at 58. Officer Lamb testified that she entered the home but did not notice any damage to the front door. *Id.* at 59. Officer Lamb spent about fifteen minutes at the residence. *Id.* Approximately an hour and fifteen minutes later, she returned to the area to investigate a report of a shooting on Volney Road. *Id.* at 59, 61. She observed a black male lying in front of 2664 Volney. *Id.* at 59. Officer Lamb stayed with the body and marked the crime scene. *Id.* at 60. Officer Lamb testified that she later observed broken glass on the porch of Defendant's house. *Id.*

On cross examination, Officer Lamb testified that the shooting victim was lying in front a of a vacant house two doors up from Defendant's house. Tr. at 64. Officer Lamb testified that she observed the damage to the front of Defendant's house without entering the front door. *Id.* at 62. After other officers questioned Defendant, Officer Lamb entered the house to escort him to jail. *Id.* at 63.

On redirect examination, Officer Lamb testified that Defendant was being arrested for possession of a weapon under a disability and for falsification of a stolen vehicle report. Tr. at 66. Officer Lamb explained that Defendant's vehicle had not been stolen; rather, it had been impounded by the Drug Task Force. *Id.*

The Government then called Detective Sergeant Zaida Miranda, a patrol supervisor for the Y.P.D. Tr. at 67. Detective Sergeant Miranda testified that she received the shooting call at Volney Road. *Id.* at 68. She arrived at the scene and stayed near the victim because there was a weapon lying near his hand. *Id.* at 69. In light of the obvious gunshot wounds to the victim, the glass on Defendant's front porch, and shell casings found at the residence, Detective Sergeant Miranda instructed another officer, Officer Rowley, to perform a protective sweep of the house for more victims or the shooter. *Id.* at 69–70.[5] Detective Sergeant Miranda testified that she never entered the house, but she did become aware of an SKS being discovered inside. *Id.* at 72. Following the protective sweep, Detective Sergeant Miranda instructed the officers to exit the house so that the crime lab could secure the scene. *Id.*

On cross examination, Detective Sergeant Miranda testified that she instructed

---

**5.** The transcript indicates that Detective Sergeant Miranda stated 2407 Volney Road, but she was apparently referring to Defendant's house.

officers to investigate Defendant's house because "[t]he door was wide open, there was glass on the porch, and there were shell casings in the residence." Tr. at 77. She also testified that it was not cold or rainy that day. *Id.* at 79.

The Government then called Y.P.D. Officer James Rowley to the witness stand. He testified that he arrived at the scene of the shooting and started a door-to-door canvas of the area. Tr. at 82. When he arrived at Defendant's house, he observed that the storm door appeared to have been shot out and he observed bullet holes in the interior door. *Id.* at 82–83. He then informed Detective Sergeant Miranda who authorized him to perform a protective sweep of the residence. *Id.* at 83–84. He testified that he performed the protective sweep. *Id.* at 85. Officer Rowley testified that Officer Rutland discovered a firearm in the residence during the protective sweep, but Officer Rowley never saw the weapon. *Id.*

On cross examination, Officer Rowley testified that the victim was lying with his head pointed north. Tr. at 87. He concluded that the victim was running north, away from the scene of the shooting. *Id.* Therefore, he began to canvas the neighborhood south of the victim's location. *Id.* Officer Rowley confirmed that he had not seen the firearm in the house. *Id.* at 90.

The Government called its final witness, Y.P.D. Detective Sergeant Ronald Rodway. Detective Sergeant Rodway testified that he was called to the scene at 2704 Volney to investigate the homicide. Tr. at 91–92. He first investigated the victim's body. *Id.* at 92–93. He testified that Detective Sergeant Miranda advised him that officers had recovered shell casings and a weapon from the house at 2704 Volney. *Id.* at 93. He testified that when he arrived, the crime lab officers were already inside the house. *Id.* Detective

Sergeant Spotleson indicated that there was an assault rifle found on the second floor. *Id.* at 94. At that point, Detective Sergeant Rodway walked up to the second floor and observed the rifle sitting in an attic area. *Id.* At some point, Detective Sergeant Rodway left the scene to investigate another scene where a vehicle had been recovered. *Id.* at 94–95. When he was driving back past 2704 Volney, he observed a vehicle pulling into the driveway, and Defendant exiting the vehicle. *Id.* at 95. Detective Sergeant Rodway accompanied Defendant into the house and questioned him about his whereabouts and his stolen car report. *Id.* Defendant informed Detective Sergeant Rodway that the Task Force had towed his car about two weeks earlier. *Id.* at 96. Detective Sergeant Rodway asked Defendant if there were any weapons in his home, and Defendant said no. *Id.* at 97. Then, Detective Sergeant Rodway asked Defendant about the SKS rifle, and Defendant admitted that it was his gun. *Id.* Defendant went on to explain the event of the October 24, 2007 shooting, and Detective Sergeant Rodway testified that the shooting was determined to be a self defense homicide. *Id.* Detective Sergeant Rodway testified that the SKS rifle was not the weapon used in the shooting on October 24, 2007 and that the other firearm was not recovered. *Id.* Defendant informed Detective Sergeant Rodway that he had thrown the gun in some bushes on the south side of Youngstown, but his description of the location proved insufficient for the police to retrieve the gun. *Id.* at 97–98.

On cross examination, defense counsel presented photographs of the SKS rifle. Tr. at 99–102; Def. Ex. 9–11. Detective Sergeant Rodway testified that he did not know if someone had to open the attic to retrieve the firearm or if anybody had opened the case in which the firearm was

located. *Id.* at 101. He testified that Officer Christopher Rutland had found the gun. *Id.*

On redirect examination, Detective Sergeant Rodway stated that the attic was the type of area where a person could have hidden. Tr. at 103.

## C. FOURTH AMENDMENT ANALYTICAL FRAMEWORK

The Fourth Amendment analytical framework set forth in Section II(C) also applies for the purposes of Defendant's second suppression motion.

## D. ANALYSIS

There are two issues in the case at bar:

1. Were the police justified in entering Defendant's home? and

2. Did the police recover the SKS rifle in plain view?

The undersigned will address each issue in turn.[6]

### (i) Police were justified in entering Defendant's house to search for victims or an armed shooter.

Defendant claims that the police did not have justification for entering his home. ECF Dkt. # 40 at 3. The undersigned recommends that the Court find that exigent circumstances justified the entrance into Defendant's residence.

■■■ Police may enter a home under exigent circumstances when the Government has demonstrated that: (1) immediate government action was required; (2) the governmental interest was sufficiently

compelling to justify a warrantless intrusion; and (3) the citizen's expectation of privacy was diminished in some way. *United States v. Rohrig,* 98 F.3d 1506, 1521 (6th Cir.1996). There are typically four exigencies justifying warrantless entry into a dwelling: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; (4) and the risk of danger to the police or to other persons inside or outside the dwelling. *Minnesota v. Olson* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

At issue in this case is the risk of danger to police or other persons inside or outside the dwelling. The Court must examine the factors set fourth in *Rohrig* to determine whether police were justified in their warrantless entry in this particular case.

■■■ First, immediate action was required. A dead person was lying on the ground near a gun, and police were afraid that there may be other victims requiring medical attention or that there may be an armed gunman loose in the neighborhood. When police observed the broken glass and bullet holes in Defendant's house, they could reasonably believe that a wounded person or an armed gunman was in the house. Either case would require immediate attention. Defendant contends that immediate action was not required because police could have secured a warrant. ECF Dkt. # 40 at 4. That argument is unavailing because the police had no way of knowing if a person in need of urgent medical care was in the house, or if they were about to be harmed by a gunman.

---

6. Again, the undersigned notes that the Government does not challenge standing. *See* ECF Dkt. # 25, 41. For the sake of completeness, the undersigned notes that Defendant resided at the premises that the police searched. The United States Supreme Court has stated, "Our decisions have made clear

that ... a home is a place in which a subjective expectation of privacy virtually always will be legitimate ..." *California v. Ciraolo,* 476 U.S. 207, 220, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). Therefore, Defendant does have standing to challenge the search at issue in this case.

■ Second, the government had a compelling interest to justify the intrusion into Defendant's house because there was broken glass on the porch and bullet holes in the wooden door. Defendant argues that police observed shell casings inside the house, but those shell casings cannot justify an intrusion because they could not be observed from outside of the home. ECF Dkt. # 40. Although Defendant's argument is valid, the broken glass on the porch, which is clearly visible in Defense Exhibit 8, provided sufficient justification for the police to approach the porch of the house. *See Katz,* 389 U.S., at 351, 88 S.Ct. 507 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").[7] Once the officers approached the storm door, they observed what appeared to be bullet holes in the interior door. At that point, the police had a strong interest in searching the home for victims or an armed gunman.

■ Turning to the final factor of *Rohrig,* the Defendant had a diminished expectation of privacy because his front door was standing open and there was no glass in his storm door.

For the foregoing reasons, the undersigned recommends that the Court find that the police officers were justified in entering Defendant's house. Therefore, suppression of any subsequently seized evidence is not required on the basis of their entry into his home.

**(ii) The Government has failed to establish that the SKS rifle was discovered in plain view.**

The second issue in this case is whether police properly seized the SKS rifle while in Defendant's residence. The Government contends that the SKS rifle was discovered in plain view in Defendant's attic. ECF Dkt. # 25 at 9.

As stated in Section II, "[i]t is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Four conditions must be present before police may seize an item pursuant to the plain view doctrine: (1) the item must be in plain view; (2) the item's incriminating nature must be immediately apparent; (3) the item must be viewed by an officer lawfully located in a place from which the object can be seen; and (4) the item must be seized by an officer who has a lawful right of access to the object itself. *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Jenkins,* 124 F.3d 768, 774 (6th Cir.1997).

Here, the Government has failed to meet its burden because it introduced practically no evidence detailing how the SKS rifle was discovered. The extent of the relevant evidence on the issue is as follows:

[Direct examination of James Rowley]

Q Did you become aware of a firearm in the residence?

A I was told later that Officer Rutland had observed a firearm inside the residence.

Q And was Officer Rutland in there with you doing a prospective [sic] sweep or a search?

A Yes, he was.

---

7. Officer Lamb's observations of the storm door during her investigation of the stolen car play no role in the undersigned's determination because Officer Lamb is not the one who discovered the broken glass after the shooting. Therefore her observation of a difference in the condition in the door cannot, in hindsight, justify other officers' warrantless entrance into the residence.

Q Did you ever see the firearm?

A No, I did not.

(Tr. at 85)

[Direct examination of Ronald Rodway]

Q Just briefly, can you tell what you did in relation to that shooting scene?

A ... And I believe it was Detective Sergeant Spotleson indicated that there was a assault rifle found on the second floor. So I walked up there and observed the assault rifle, it was sitting in a little attic area at the top of the stairs to the left, as you walked up.

(Tr. at 92–94)

[Cross examination of Ronald Rodway]

Q Do you know whether or not the case was, the gun case was closed when they were looking for the gun? Or when they were—when they— when somebody went in and found it?

A No, I don't.

Q Do you know who found it?

A I wasn't able to determine that day but later I became aware that I believe it was an Officer Rutland, Christopher Rutland, that found the gun.

Q Okay. He found the gun. And was it your understanding that he found it inside this storage room?

A That's what I was told, yes.

Q Okay. And we don't know if the door to the storage room was closed or not. Is that right?

A That's correct.

Q And we don't know whether or not the gun case was closed or not when he went inside. Is that right?

A That's correct, sir.

(Tr. at 101–02)

Defendant also introduced a photograph of the SKS rifle. Def. Ex. 11. Apparently, this photograph was taken by a member of the crime lab who did not testify. *See* Tr. at 99.

The determinative question is whether this evidence is sufficient to establish that the firearm was properly seized under the plain-view exception to the warrant requirement.

 The undersigned first notes that the Government has wholly relied on hearsay testimony. Hearsay evidence is admissible at suppression hearings. *United States v. Killebrew*, 594 F.2d 1103 (6th Cir.1979) ("In a suppression hearing to determine probable cause hearsay evidence is admissible."); *United States v. Sissler*, No. 91–2113, 1992 WL 126974 at *2 (6th Cir.1992) unpublished ("[W]e observe that the Supreme Court has rejected Confrontation Clause challenges to the use of incompetent testimony during suppression hearings. *See United States v. Matlock*, 415 U.S. 164, 175, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *McCray*, 386 U.S. at 314; *see also United States v. Boyce*, 797 F.2d 691, 693 (8th Cir.1986) ('the right of confrontation does not apply to the same extent at pretrial suppression hearings as it does at trial.'). The Court has repeatedly explained that '[t]he right to confrontation is basically a trial right.' ").

**(a) Proposed findings of fact.**

Turning to the weight of the Government's evidence, the undersigned first makes the factual determination that Officer Rutland's out of court statement that he discovered the rifle falls short of establishing by a preponderance of the evidence that the rifle was in plain view. The details of Officer Rutland's discovery are largely unknown. The undersigned does not know whether the gun case was out in the open with an immediately apparent incriminating nature. The undersigned does not know if Officer Rutland was, in

fact, the first person to discover the firearm.

Officer Rowley and Detective Sergeant Rodway's testimony also falls short of establishing plain view. Neither officer observed Officer Rutland discover the SKS rifle. Therefore, neither officer has firsthand knowledge that the weapon was in plain view. In fact, Officer Rowley admitted that he never observed the firearm at all, and Detective Sergeant Rodway did not see the weapon until after the protective sweep and after the crime lab had been through the residence. *See* Tr. at 85, 93–94.

Lastly, the photographs taken by the crime lab should be afforded no weight because the undersigned received no testimony as to the crime lab's procedure for photographing evidence. The undersigned is not convinced that the SKS rifle was photographed before law enforcement officers handled it because there is no evidence of record upon which to base such a conclusion.

For the foregoing reasons, the undersigned recommends that the Court find that the Government's evidence falls short of establishing the plain view discovery of the rifle by a preponderance of the evidence.

**(b) Summary of pertinent authority.**

The foregoing factual conclusion is consistent with existing caselaw. The undersigned considers the following three cases to be particularly relevant: *United States v. Kiyuyung,* 171 F.3d 78 (2d Cir.1999); *United States v. Herndon,* 501 F.3d 683 (6th Cir.2007); *United States v. Gregory,* Nos. 91–6400, 91–6431, 1992 WL 393144 (6th Cir.1992) unpublished. Based on the holdings in these three cases, the undersigned concludes that the Government fails, as a matter of law, to establish that the plain view exception applies when the Government does not offer testimony from the officer who discovered the evidence or from a person who observed the officer discover the evidence.

In *Kiyuyung,* police officers arrested a woman who was driving a stolen car. *Kiyuyung,* 171 F.3d at 80. Police escorted her to her nearby apartment so that she could use the restroom before being transported to jail. *Id.* The officers performed a protective sweep of the apartment prior to letting the arrestee enter. *Id.* One officer, Abousamra, searched the hallway leading to the restroom, as well as the restroom itself and an adjacent closet. *Id.* He then allowed the arrestee to use the restroom while his partner, Quiles, stood guard outside. *Id.* While the arrestee was using the restroom, Quiles called out that he had discovered a firearm on a shelf next to the restroom. *Id.* The officers continued to search and found three guns, allegedly in plain view. *Id.* When the arrestee emerged from the restroom, she indicated that the firearms belonged to her roommate, who admitted to owning them. *Id.* at 82. The Government charged the roommate with a violation of 18 U.S.C. § 922(g)(1). *Id.* at 79. The district court conducted a pretrial suppression hearing. *Id.* at 79–80. Quiles, the officer who discovered the first firearm, did not testify at the hearing. *Id.* at 82.

The Second Circuit Court of Appeals reversed the district court's denial of the defendant's suppression motion. The court held as a matter of law that the Government failed to establish that the firearms were discovered in plain view because the officer who first discovered them did not testify at the suppression hearing. *Kiyuyung,* 171 F.3d at 83–84. The court noted that Abousamra did not testify that Quiles found the first gun in plain view because "he was not with Quiles when Quiles found the gun; according to Abous-

amra, Quiles found the gun and then summoned Abousamra to look at it." *Id.* at 84. The court determined that the district court erred in finding that the firearms had been discovered in plain view because Abousamra did not discover them during his security search, he could not recall whether the closet doors were open, he did not testify that Quiles said the closet doors were open, and he "did not even venture to ascribe to Quiles a conclusory statement that the first gun had been in plain view." *Id.*

The Sixth Circuit Court of Appeals treated *Kiyuyung* with controlling weight in *United States v. Herndon,* 501 F.3d 683 (6th Cir.2007). The court, however, upheld the district court's denial of a suppression motion because the facts were distinguishable from those in *Kiyuyung*. *Id.* at 694. The *Herndon* case involved prosecution for possession of child pornography. *Id.* at 686–87. In *Herndon,* a convicted sex offender, Herndon, informed his probation officer, Harrien, that he had been using the internet to look for new jobs. *Id.* at 685. Harrien grew concerned over Herndon's internet usage. *Id.* Harrien obtained his supervisor's authorization to search Herndon's computer. *Id.* at 686. Harrien ran a computer program that discovered 12 thumbnail pornographic images on Herndon's computer. *Id.* Harrien contacted his supervisor who dispatched two uniformed police officers to secure the scene until a detective could arrive. *Id.* Approximately one hour later, Detective Cooley arrived at the scene and observed the evidence in plain view. At the sup-

pression hearing, Harrien testified and explained "how the images appeared on Herndon's computer screen and how they became plainly visible to Cooley who, as he testified, did not take any additional steps to see the pictures." *Id.* at 693. The Sixth Circuit held that the plain view exception applied because Harrien offered unequivocal and uncontested testimony as to how he observed the pornographic evidence. *Id.* at 694.[8] The court accordingly affirmed the district court's denial of the suppression motion. *Id.*

In *Gregory,* the Sixth Circuit also affirmed a district court's denial of a motion to suppress evidence. *Gregory,* 1992 WL 393144 at *5. The *Gregory* case began with a task force investigation into four patches of marijuana growing in a remote and rugged portion of the Daniel Boone National Forest in Kentucky. *Id.* at *1. During surveillance of one of the patches, Detective Johnny Creech observed a bass boat drop off a passenger who began tending to the plants. *Id.* Detective Creech announced himself and the suspect fled. *Id.* Detective Creech then radioed a description of the bass boat to be broadcasted to other officers. *Id.* at *2. Later, officers observed the bass boat with two men in it. *Id.* The officers asked the men to accompany them to an inlet on the lake. *Id.* Ten to twenty minutes later, Detective Creech arrived and immediately identified one of the men as the suspect he had encountered at the marijuana patch. *Id.* Detective Creech then looked in the bottom of the bass boat and observed a pair of pants[9] similar to those he had seen the

---

8. The undersigned surmises that the plain view exception to the warrant requirement applied because Harrien was entitled to search Herndon's computer as a condition of probation.

9. The *Gregory* court indicated in its factual synopsis that the suspect was wearing camou-

flage pants in the marijuana patch, but the court later states that Detective Creech discovered brown pants similar to those that suspect had been wearing. *See Gregory,* 1992 WL 393144 at *1–*2. This inconsistency appears to be an error. The important point, however, is that the pants Detective Creech discovered had an immediately apparent in-

suspect wearing in the marijuana patch. *Id.* He also observed a large backpack similar to the one the suspect was carrying. *Id.* The two men in the bass boat were charged with federal drug offenses. *Id.* at *3. Both defendants filed motions to suppress. *Id.* A magistrate judge conducted a hearing and determined that the items found in the bottom of the boat were properly discovered in plain view. *Id.* The district court denied the suppression motions on the grounds that the items were seized under a lawful inventory search. *Id.* at *4. On appeal to the Sixth Circuit, one of the defendants argued that the magistrate judge erroneously found the evidence on the floor of the bass boat to be in plain view because Detective Creech did not testify at the suppression hearing. *Id.* at *5. The Sixth Circuit stated:

> We are not aware of any requirement that the officer who conducts a plain view search testify at the suppression hearing. *Several other officers **who were present** while Creech searched the bottom of the boat testified* at the hearing, and their testimony supports the finding that the items he found were on the bottom of the boat in plain view. Therefore, we uphold the admission of the items found in the bottom of Beckman's boat.

*Id.* (emphasis added).

**(c) Application of pertinent authority.**

Based upon the holdings in *Kiyuyung, Herndon,* and *Gregory,* the undersigned recommends that the Court find that the Government fails, as a matter of law, to establish that the plain view exception applies when the Government fails to offer testimony from the officer who discovered the evidence or from a person who observed the officer discover the evidence. This rule of law explains the holdings in all

three cases. Further, it dictates that the evidence in the case at bar must be suppressed because neither Officer Rutland nor an eyewitness to his discovery testified at the suppression hearing.

Further, the case at bar is similar to *Kiyuyung,* where the appellate court reversed a district court for denying a suppression motion, and the case at bar is distinguishable from *Herndon* and *Gregory* where the appellate court upheld the district court's denial of a suppression motion.

In *Kiyuyung,* two officers entered a residence to perform a protective sweep and the firearm Quiles discovered was suppressed because he did not testify at the suppression hearing, although his partner who was in the residence at the same time did testify. *Kiyuyung,* 171 F.3d at 83–84. It is particularly noteworthy that Abousamra had to be summoned to the scene; he could not observe Quiles' discovery from his vantage point. *Id.* at 84. Here, Officer Rutland discovered the firearm while performing a protective sweep along with Officer Rowley. Officer Rutland did not testify, and Officer Rowley never saw the firearm. Therefore, like Abousamra had no firsthand knowledge that the firearm in *Kiyuyung* was in plain view, neither did Officer Rowley. It follows that the evidence in this case must be suppressed as it was in *Kiyuyung*—a case that the Sixth Circuit has treated as authority.

Although the Sixth Circuit upheld a district court's denial of suppression motions in *Herndon* and *Gregory,* those cases are readily distinguishable. In *Herndon,* the officer who made the initial discovery **did** testify at the suppression hearing. *Herndon,* 501 F.3d at 694. The issue before the court was whether the Government's fail-

criminating nature invoking the plain view

exception.

ure to present testimony from officers who had secured the scene was detrimental to the Government's claim of plain view. Consequently, the *Herndon* court dealt more with the issue of chain of custody of the evidence that the probation officer discovered in plain view. Further, *Gregory* is distinguishable on its facts. While the officer who seized evidence from the floor of the bass boat did not testify at the suppression hearing, other officers in the immediate vicinity did testify and provided an evidentiary basis for concluding that the seized evidence was in plain view. *Gregory*, 1992 WL 393144 at *5. Here, the undersigned heard no testimony that would support a conclusion that the SKS was in plain view. Again, the circumstances under which Officer Rutland observed the SKS are wholly unknown.

## E. CONCLUSION: SECOND SUPPRESSION MOTION

For the foregoing reasons, the undersigned RECOMMENDS that the Court GRANT Defendant's second motion to suppress evidence (ECF Dkt. # 23) and SUPPRESS the evidence seized from Defendant's residence on October 24, 2007; namely, the rifle described in the Indictment as a "Yugoslavian, Model 59/66 7.62x39mm caliber rifle, serial number F161943," the ammunition, the gun case, Defendant's admission that he owned the firearm, and any testimony relating to the foregoing evidence.

## IV. CONCLUSION AND RECOMMENDATION

For the Court's convenience, the undersigned reiterates its recommendation for both motions:

With regard to Defendant's first motion (ECF Dkt. # 17), The undersigned RECOMMENDS that the Court: ADOPT the proposed findings of fact; FIND that the October 4, 2007 traffic stop was unreasonable; GRANT Defendant's motion; and SUPPRESS all evidence obtained during the stop and as a result of the stop; namely, the Smith and Wesson Model SW40VE, .40 caliber handgun, serial number PBU8056 described in the Indictment and any testimony relating to the handgun.

Should the Court decide that the traffic stop was reasonable, the undersigned RECOMMENDS that the Court find that the search of Defendant's vehicle at the Task Force Office was unreasonable. In that event, the undersigned RECOMMENDS that the Court GRANT Defendant's motion and SUPPRESS all evidence obtained during the search of Defendant's vehicle and as a result of that search; namely, the Smith and Wesson Model SW40VE, .40 caliber handgun, serial number PBU8056 described in the Indictment and any testimony relating to the handgun.

With regard to Defendant's second motion (ECF Dkt. # 23), the undersigned RECOMMENDS that the Court GRANT Defendant's second motion to suppress evidence (ECF Dkt. # 23) and SUPPRESS the evidence seized from Defendant's residence on October 24, 2007; namely, the rifle described in the Indictment as a "Yugoslavian, Model 59/66 7.62x39mm caliber rifle, serial number F161943," the ammunition, the gun case, Defendant's admission that he owned the firearm, and any testimony relating to the foregoing evidence.